[Sac. No. 3405. In Bank.—August 22, 1923.]

In the Matter of a Proceeding to Validate the SUTTER–BUTTE BY–PASS ASSESSMENT No. 6 OF THE SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT.

[1] RECLAMATION DISTRICTS—SUTTER-BUTTE BY-PASS PROJECT No. 6— SPREADING OF ASSESSMENT—NONCONSIDERATION OF OBJECTIONS TO —APPEAL.—Objections by land owners within the assessment district formed for assessing for the work of construction of the Sutter-Butte By-Pass Project No. 6, involving the question of the method of the spreading of the assessment between the different characters of land, as distinguished from the question of the legality of the assessment, are excluded from consideration on appeal from the judgment validating the assessment by section 8 of the act of the legislature of 1919 (Stats. 1919, p. 1092), which provides that the decision of the three judges sitting as a court shall be "final and conclusive . . . and no appeal from the judgment given and made by said court shall be had."

[2] ID.—APPORTIONMENT OF ASSESSMENT—APPEAL—POWER OF LEGISLATURE.—While the legislature, in the enactment of the act of 1919 (Stats. 1919, p. 1092), did not have the power to deprive a litigant of the right to an appeal upon any question of law touching the validity of the assessment, it did have the right to forbid the consideration upon appeal of those questions of fact which involved the correctness of the apportionment of the assessment; and the fact that the legislature did not have the power to make the judgment conclusive upon every question cannot be said to operate to deprive the legislature of the will and the power

to make a judgment conclusive upon those questions which in strictness do not trench upon the validity of the assessment.

[3] ID.—SPREADING OF ASSESSMENT—DECISION OF STATUTORY BOARD—REMEDY OF APPEAL—POWER OF LEGISLATURE.—The legislature may, in its discretion, make the decision of a statutory board concerning the spreading of an assessment final and conclusive; and the decision of such board is conclusive, except where an appeal is expressly provided by law. The remedy of an appeal to some specified subordinate court may be provided for by the statute, but such a remedy is a matter of grace and not of right, and does not confer the privilege of having the judgment of the reviewing court again upon appeal taken to a court of last resort.

[4] ID.—JUDGMENT VALIDATING ASSESSMENT—DUAL CHARACTER OF.—The judgment of the superior court validating the assessment for the construction of Sutter-Butte By-Pass Project No. 6 was, in effect, dual in its nature, to the extent that it embodied a determination of the legal questions involving the validity of the assessment and the judgment of an equalization board concerning the spreading of the assessment. As to the former there was doubtless a right of appeal; but inasmuch as the legislature had the power to make the assessment final and conclusive had it been equalized by an administrative board, it had the same power to make an equalization of the assessment final and conclusive when made by the superior court sitting, in effect, as an equalizing board.

[5] ID.—EXEMPTION OF LAND OWNERS—INTENT.—It was the intent and the definite purpose of the legislature by the amendment of 1919 (Stats. 1919, sec. 2, p. 1126) to exempt the land east of the Sutter-Butte By-Pass Project No. 6, above contour 40, from assessment for flood control benefit.

[6] ID.—EXEMPTION FROM ASSESSMENT—CONSTITUTIONAL LAW.—The amendment of 1919 (Stats. 1919, sec. 2, p. 1126), exempting the lands east of the by-pass, above contour 40, from assessment for flood control benefit is not unconstitutional for the reason that it is always competent for the legislature to itself determine the lands to be benefited, either by describing the same or by laying down a rule which serves to identify them and to determine the amount of the benefits accruing to those lands. Such determination is conclusive and not subject to review, this being upon the theory that the land owners themselves have had a hearing before the legislature in arriving at such determination by and through their representatives in the legislature.

---

3. Right of legislature to authorize assessments in a levee district upon benefited property, note, 58 L. R. A. 758.

[7] Id.—Establishment of Boundaries of Assessment District—Subsequent Reduction in Estimated Cost—Effect upon Assessment.—The reduction by the reclamation board of the estimated cost of the project, after the assessment district had been formed and a hearing with respect thereto had before the assessors, did not vitiate the whole assessment, where the only step taken by the assessors before the estimate was reduced by the board was the establishment of the limits of the property benefited by the plan.

[8] Id.—Basis of Benefits—Plans.—It is the plan of the project which forms the basis of the determination by the assessors of whether certain lands would or would not be benefited and, therefore, whether they should or should not be included within the proposed assessment district.

[9] Id.—Reduction in Cost—Change in Plans—Appeal—Presumption.—In a proceeding to validate an assessment for the construction of the Sutter-Butte By-Pass Project No. 6, where the estimated cost of the project was reduced by the reclamation board after the establishment of the limits of the property benefited by the plan, it will be assumed on appeal from the judgment validating the assessment that no material changes were made in the plans, since the burden is upon the appellants to show error.

[10] Id.—Change in Plans—Validity of Assessment.—In such a proceeding, even if changes may have been made in the plans, after the "preliminary report" of the assessors which, as required by the statute, contained a "general description" of the land which "in their opinion" would be benefited, from the language of the statute directing the assessors to make such a report fixing the boundaries, the original determination of the boundaries was merely tentative, and subject to revision upon hearings held after the amendment of the plans; and this being so, it cannot be said that the revision of the estimates of the reclamation board after the filing of the preliminary report by the assessors rendered the entire assessment a nullity.

[11] Id.—Apportionment of Assessment—Notice by Publication—Sufficiency of.—In so far as the decision of the statutory court involved the correctness of the apportionment of the assessment, the notice given by publication was sufficient to answer the requirements of due process of law; in fact, no court proceedings at all are necessary, it being sufficient to satisfy the requirements of due process of law if a hearing has been had before the assessing board itself.

[12] Id.—Proceeding Before Court—Character of Notice Required.—A notice by publication being sufficient to satisfy the requirements of due process if the hearing is before a statutory board, it is also sufficient where a court proceeding has been authorized; if

the assessment can be made a lien without personal service by action of a subordinate body, it can be made a lien by a court without personal notice.

[13] ID.—ASSESSMENT—NOTICE—SUFFICIENCY OF.—The notice of the county clerk fixing the time for the objection to the assessment lists gave adequate information, by reference, to the land owners affected, where the notice was given that the assessment lists had been filed in the office of the clerk of the court before which the action for validating the assessment was pending and that any person objecting thereto might appear and be heard in opposition to the assessment against his property as shown by these lists, and the statute itself specifically defined the boundaries of the drainage district and was notice to the land owners therein situated that in all probability their lands would be subjected to an assessment for the cost of the proposed improvements and thereby put them upon notice to watch the subsequent proceedings.

[14] ID. — NOTICE — APPEAL — PRESUMPTION. — Where no objection is urged on appeal from the judgment validating the assessment to the adequacy of the notices given of the hearing before the assessors and before the board of reclamation, the regularity and legality of such notices will be presumed.

[15] ID.—DRAINAGE DISTRICT—SINGLE ENTITY.—A drainage district, even though the lands embraced therein consist of several and separate parcels of land which extend over and into two or more counties, is in its very nature a single entity, and must be considered and treated as a unit extending to and embraced within the boundaries of the district.

[16] ID. — QUIETING TITLE — PLACE OF TRIAL — JURISDICTION. — Conceding that the proceeding for the validation of the Sutter-Butte By-Pass Project No. 6 assessment is a suit in equity to quiet title to land situate in Yolo, Sacramento, and Sutter Counties, jurisdiction is given by the constitution, which provides that actions quieting title to real estate shall be commenced in the county in which the real estate, or any part thereof, is situated, to the superior court in and for the county of Sutter, the county in which the greater part of the land affected is situated.

[17] ID.—SERVICE BY PUBLICATION—SPECIAL LEGISLATION—CONSTITUTIONAL LAW.—The provision in the act (Stats. 1915, p. 1338, sec. 10, and Stats. 1919, p. 1092, sec. 5) for service by publication is not special legislation and does not violate section 25 of article IV of the constitution, which prohibits the legislature from passing special laws "regulating the practice of courts of justice."

[18] ID. — CONSTITUTIONAL LAW — STATUTORY CONSTRUCTION.—An act applying uniformly to any single class in its entirety, when the

classification is founded upon some natural, intrinsic, or constitutional distinction, is not special legislation.

[19] ID. — CLASSIFICATION BY LEGISLATURE — DISCRETION — APPEAL.— The legislature is vested, primarily, with the discretion to make the classification, and the courts will not disturb a legislative classification unless it is palpably arbitrary in its nature and neither founded upon nor supported by reason, and said courts, when possible, are permitted to and do indulge in a liberal construction of an assailed statute.

[20] ID. — PROCEEDING FOR VALIDATION OF ASSESSMENT — REASON FOR SPECIAL CLASSIFICATION.—The nature of the whole proceeding for the validation of the assessment for the reclamation and flood control work to protect lands from the overflowing of the Sacramento River is sufficiently distinct and different from ordinary civil actions to justify the creation of a class for which special rules of procedure may be provided.

[21] ID.—PENDING APPLICATION FOR PEREMPTORY WRIT OF PROHIBITION —JURISDICTION OF SUPERIOR COURT.—The statutory court having acquired jurisdiction in the first instance of the proceeding for the validation of the assessment by the filing of the assessment and by the publication of the notice required by the statute, retained jurisdiction of the proceeding pending the hearing by the supreme court of an application for a peremptory writ of prohibition.

[22] ID.—CONTINUANCES — ORDERS — NUMBER OF SIGNATURES.—A majority of the judges sitting in a proceeding to validate such an assessment may make an effective order for a continuance of the hearing of the proceeding.

[23] ID. — PLACE OF SIGNING ORDERS — EFFECT UPON VALIDITY OF ORDERS.—There is no merit in the contention that the order for a continuance was void because it was signed by one, or perhaps two, of the judges outside of the county in which the court was sitting; the order for a continuance relates to but a mere matter of procedure necessary to put the proceedings in a condition to be heard, and as such its validity was not impaired by the fact that it may have been signed outside the county in which the proceeding was pending.

APPEAL from a judgment of the Superior Court of Sutter County. G. W. Nicol, J. W. Bartlett, and J. S. Koford, Judges. Affirmed.

The facts are stated in the opinion of the court.

Frank Freeman for State Reclamation Board of California.

Robert T. Devlin for Reclamation District No. 1500.

Morrison, Dunne & Brobeck, Burke Corbet, A. C. Huston, A. L. Huston, Meredith, Landis & Chester, and Edward F. Treadwell for Certain West Side Objectors.

A. H. Hewitt for Levee District No. 70.

Arthur Coats, W. H. Carlin, Lawrence Schillig, and A. H. Hewitt for Reclamation District No. 70.

George Clark and Elston, Clark & Nichols for Hershey Heirs-West Side Objectors.

John S. Partridge for West Side Objectors.

Thomas Rutledge, U. W. Brown, and Seth Millington for Sutter Basin Objectors, J. W. Browning and West Side Objectors.

Haven & Athearn for Reclamation District No. 1660.

Stephen W. Downey for Sacramento and San Joaquin Drainage District.

Theodore W. Chester for Commercial Investment Co. et al.

Devlin & Devlin, *Amici Curiae.*

LENNON, J.—This is an appeal from a judgment of the superior court, in and for the county of Sutter, three judges sitting, purporting to validate an assessment, aggregating in value some eight millions of dollars, spread over certain lands of and in the Sacramento and San Joaquin Drainage District.

The controversy presented upon the appeal had its origin in the adoption, in the form of a legislative enactment by the legislature of the state of California, of the report of the California Debris Commission, which provided a plan for the flood control of the Sacramento River. (Stats. 1911 (Ex. Sess.), p. 117.)

It is a matter of common knowledge that the Sacramento River in its natural condition is able to carry within its

banks during flood seasons only a very small proportion of the water delivered to it from its watershed. The result is that the surplus waters spread out and flood the country on both sides of the river. For more than fifty years reclamation districts have been organized on the west side of the Sacramento River and levees built to protect the adjacent lands from submergence. The construction of levees on the west side of the river had the natural effect of throwing the surplus water, which had formerly overrun the west side, to and upon the lands on the east side, thereby naturally increasing the height of the flood plane on that side. At that time the rule was laid down by various decisions in this state, following the English common-law rule, that flood waters were a common enemy, and land owners whose lands were inundated by levees constructed by other land owners could not enjoin such construction or recover damages for the injury resulting therefrom to their lands. It was held that they must, in turn, protect their lands, if they so desired, by the construction of levees. In other words, it was the declared rule that the right of a land owner was, not to be protected from injury by flood water caused by the construction of levees on his neighbor's lands, but to protect his own land, in turn, by the construction of levees. Obviously in such a situation it was only a question of time until the land owners on the east side of the river would begin to build levees in an endeavor to retain and reclaim the lands on the east side, with the obvious and inevitable result of compelling the land owners on the west side to raise their levees. The individual reclamation work would, therefore, develop into a contest between the land owners on each side of the river (each attempting to build his levee higher than those of the land owner on the opposite side). It would also happen at times that back lands which were formerly unprotected by levees, but nevertheless free from the danger of flooding, would become subject to annual submergence. Clearly, therefore, the only adequate method of preventing this result was the unification of the individualistic and antagonistic efforts of the land owners on the opposite sides of the river into one comprehensive co-ordinating plan looking toward the flood control of the river in its entirety.

Only by carrying into effect some such plan could the lands on both sides of the river be reclaimed.

Exhaustive investigations were made in an effort to find the best solution to the problem. One method suggested, known as the Dabney plan, called for the widening of the river-bed sufficiently to take care of all the surplus water. This plan, however, was found to be too expensive, inasmuch as it involved the purchase of valuable lands on both sides of the usual river channel. Of the several solutions offered, the report of the California Debris Commission, created by the United States government to investigate the problem, was found to be the most feasible, and it was accordingly adopted by the California legislature, by an act entitled "An Act approving the report of the California Debris Commission," etc. (Stats. 1911 (Ex. Sess.), p. 117.)

This plan provided, in general, for the leveeing of both sides of the Sacramento River to protect the adjacent lands from submergence, and also provided that a by-pass, practically paralleling the Sacramento River on the east, should be acquired, into which the surplus flood waters of the Sacramento River should be turned through certain openings in the levees on the east side of the Sacramento River. The proposed by-pass, which is in its nature an auxiliary river, was planned to leave the Sacramento River at "Moulton Weir," which is just west of "Marysville's Buttes," sometimes known as "Sutter Buttes," and to continue through Butte Basin and Butte Slough Basin and thence through the Sutter Basin to the confluence of the Sacramento and Feather Rivers, where it would empty into the Yolo by-pass.

Below Moulton Weir the capacity of the Sacramento River channel was estimated to be 65,000 second-feet, and since the estimated water presented to the river at this point during flood periods was 250,000 second-feet, it was planned to divert 185,000 second-feet of water into the by-pass through the "Moulton Weir." The capacity of the river channel thereafter decreases at a point subsequently designated as the Tisdale by-pass to 30,000 second-feet, and it was therefore planned that a break should be made in the east levee of the river at this point and a channel constructed from the river to the Sutter-Butte by-pass to re-

191 Cal.—42

lieve the river at this point of the excess 35,000 second-feet which the river was incapable of handling.

The report included plans for building levees on both sides of the Sutter-Butte by-pass to prevent the inundating of lands on either side of the by-pass, and also provided that levees should be built on both sides of the channel leading from the Sacramento River to the Sutter-Butte by-pass at the Tisdale Weir.

The act of 1911 which adopted the report also created a board to be known as the "Reclamation Board," which was to have entire charge of the carrying out of the plan and which should have the power to see that all of the reclamation work in the future should be performed in accordance with the report. (Stats. 1911 (Ex. Sess.), sec. 2, p. 117.)

By act of 1913 the Sacramento and San Joaquin Drainage District was created, as a governmental agency, for the purpose of carrying the plan into effect. Its boundaries were specifically defined and its management and control vested in the reclamation board already created. (Stats. 1913, p. 252.)    Section 13 of this act gave to the reclamation board the power of levying assessments for the carrying into execution of the plan, and provided that the plan as a whole should be divided into separate portions or projects, to facilitate the levying of the assessment for each particular portion or project which should be carried out and constructed as separate units. It provided that each particular portion or project should be designated by a name and number and that all assessments, plans, and funds should be kept separate and should be used only for the purpose of carrying out the particular portion or project. In pursuance of this provision, the reclamation board designated the assessment, the validity of which is here contested, as "Sutter-Butte By-Pass Assessment No. 6," and the project for the construction of which this assessment was levied as "Sutter-Butte By-Pass Project No. 6."

It was evidently not the intention of the legislature to vest in the reclamation board the sole power of carrying out the plan in detail, for it provided that any reclamation district, levee district, drainage district, or municipal corporation should have the right to acquire rights of way, or other easements, and to construct levees,

cuts, canals, or gates, subject, of course, to the approval
of the plans by the reclamation board, which works might
be conveyed to the drainage district upon compensation
being made of the actual reasonable cost. In other words,
it was contemplated that the different owners and agen-
cies interested in flood control and reclamation of the
lands should work in conjunction with the drainage district,
the drainage district supplementing the work of the other
agencies whenever necessary or desirable for the carrying
out of the general plan. (Stats. 1913, sec. 18, p. 275.)

In the same year, 1913, the legislature passed an act cre-
ing Reclamation District No. 1500, which was situated on
the east side of the Sacramento River, and whose boundary
on the east was a portion of the west line of the Sutter
by-pass, and whose northern boundary was the south line
of the Tisdale by-pass. The act creating the district au-
thorized and directed the reclamation district to construct
the south levee of the Tisdale by-pass and a portion of the
west levee of the Sutter Basin by-pass. (Stats. 1913,
p. 130.) In the performance of the duty therein imposed,
and under the direction and approval of the reclamation
board, Reclamation District 1500 proceeded to construct
the south levee of the Tisdale by-pass and the west levee of
the Sutter by-pass. The construction of the west levee of
the Sutter by-pass had the effect of raising the flood plane
of the lands east of the by-pass not yet protected by levees
and endangering lands above contour 40 which, as back
lands, had theretofore never been subject to flood. A suit
was instituted by the owners of these lands to enjoin the
construction of the levees until such time as the east side
levee should be constructed, both upon the ground that
the by-pass area was a natural watercourse and that the con-
struction of the levee was an illegal interference with the
waters flowing in a natural watercourse, and furthermore,
that the construction of the levees prevented the adequate
drainage of the plaintiff's lands. In *Gray* v. *Reclamation
Dist. No. 1500*, 174 Cal. 622 [163 Pac. 1024], the right of
these land owners to enjoin the construction of the levee was
denied upon the ground that the construction of levees was
merely a method of protecting the lands, as the reclama-
tion district had a right to do, from flood waters, which

were a common enemy, and furthermore, that it was a legitimate exercise of the police power of the state.

In 1915 (Stats. 1915, p. 1034), Reclamation District 1660, lying just north of Reclamation District 1500, was created, situated on the east side of the Sacramento River, its south boundary being the north boundary of the Tisdale by-pass and its east boundary being the west line of the Sutter-Butte by-pass.

In November, 1917, the first steps were taken by the reclamation board in the proceedings for the levying of an assessment for the construction of the Sutter-Butte by-pass project. On that date plans and estimates were prepared and approved, the estimated cost being $14,993,190. On December 27, 1918, the board revised and amended its plans and estimates, reducing the estimated cost to $10,624,522.25. On August 11, 1919, the second amended plan and estimate of cost for the project were adopted by the board, the cost being estimated at $11,995,578.71, and the plan remaining practically the same as the first amended plan. Thereupon the preliminary report of the assessors appointed by the reclamation board to apportion the assessment was made, fixing the boundaries of the proposed assessment district on September 27, 1919, and a hearing before the assessors with respect to the assessment was held on November 7, 1919. Thereafter, on September 20, 1920, the reclamation board again adopted a third amended plan and estimates of cost, the estimate being reduced to $8,155,798.70. It will be noted that the final plans were adopted *after* the report of the assessors fixing the boundaries of the proposed assessment district. And it is also to be noted that the change consisted principally in the reduction of the estimated cost of the project. The area included by the assessors within the assessment district's boundaries included lands on the west side of the Sacramento River, lands in the Butte and Sutter Basin, on the east side of the river, and certain lands east of the proposed Sutter-Butte by-pass.

In 1919 three acts were passed by the legislature relative to the proposed flood control work. One act provided for the authorization, issuance, and sale of bonds based upon the assessments levied by the reclamation board, and provided the judicial procedure to be followed in validating the assessment in order that the bonds might be issued. (Stats.

1919, p. 1092.)   Another act, amending the original act of 1911 as subsequently amended, specifically provided that in determining the benefits that would accrue to each particular tract of land by the construction or maintenance of the works contemplated by any particular project or unit, "the works of such project or unit shall be considered as a whole."   The latter act further provided that the "lands shall be assessed for the work embraced in such project or unit only in the proportion that they will or may be benefited by the construction of the entire works embraced in said project or unit," and that "no lands shall be considered as benefited by the construction or maintenance of the works embraced in such project or unit, or any part or portion thereof, nor shall any lands be assessed for the expense of the construction or maintenance of such project or unit or any part or portion thereof, because such lands have been or may be first endangered or flooded, or the natural drainage thereof obstructed by the construction or maintenance of any part or portion of the works embraced in such project or unit in advance of or prior to the completion of the construction of the entire works embraced in such project or unit."   (Stats. 1919, sec. 2, p. 1126.)   By another act the sum of $3,000,000 was appropriated by the state for the purpose of co-operation in the construction of the Sutter-Butte By-pass Project No. 6.   (Stats. 1919, p. 1209.)   And it was specifically provided that the assessors in apportioning the assessment should set opposite each tract of land the amount assessed for the flood control benefit, and that the $3,000,000 appropriated by the legislature should be applied only to the flood control benefit assessment.   (Stats. 1919, sec. 3, p. 1129; sec. 5, p. 1130.)

The assessors in determining the apportionment of the assessment divided the benefits to be derived by the construction of the project into two general groups, "flood control benefit" and "reclamation benefit."   To solve the problem of how much of the total cost should be apportioned to reclamation benefits, the assessors took the situation as it existed prior to the construction of any part of the project and undertook to ascertain the total cost of reclaiming the land independent of the project.   The sum total of the cost, including both levee construction and the drainage necessarily required for reclamation, was apportioned exclu-

sively to the lands on the east side of the river subject to overflow. This sum was then deducted from the sum total of the entire cost of the project and the difference, representing the flood control benefit, assessed to lands on both the east and the west side of the river as being lands which would benefit by the removal of the flood menace.

After the tentative apportionment of the assessment by the assessors, hearings were held before commissioners appointed by the reclamation board to levy the assessment, and after certain statutory proceedings the commissioners finally made the assessment, which, over the protest of certain property owners, was approved by the reclamation board.

Thereafter, in keeping with the provision of the statute (Stats. 1919, p. 1092, secs. 5–8), the proceeding now before us upon appeal was instituted in the superior court, in and for the county of Sutter, that being the county in which "the largest acreage of land affected by the assessment" is situate, for the purpose of validating the assessment preparatory to the issuance of bonds. Judgment validating the assessment was rendered by the unanimous vote of three judges.

The main ground of objection, and the one most strongly urged upon this appeal, is the claim by the land owners on the west side of the Sacramento River that their land is compelled by the assessment to bear an undue and unwarranted burden of the required expense. They argue that the lands on the east side of the river and the lands east of the by-pass should bear a greater share of the burden, and in this behalf contend that (1) the lands east of the by-pass were not and should have been assessed for flood control features of Sutter-Butte By-Pass Project No. 6; (2) that the levees constructed by Reclamation Districts 1500 and 1660, which levees are a part of the general plan of flood control work, should have been assessed only to those reclamation districts and should not have been included in the assessment spread over the lands of the entire assessment district, and (3) that the west side should have been assessed only for the amount necessary to acquire the land within the by-pass, and should not have been assessed for any of the construction work of the levees built in order to confine the water within the by-pass.

[1] These objections, involving, as they do, the question of the method of the spreading of the assessment between the different characters of land, as distinguished from the question of the legality of the assessment, have been excluded, we think, from our consideration by the provisions of section 8 of the Statute of 1919 (Stats. 1919, p. 1094), which provides that the decision of the three judges sitting as a court shall be "final and conclusive . . . and no appeal from the judgment given and made by said court shall be had."

There can be no doubt but that the legislature intended by such provision, and attempted, to make the decision of that court binding as to all questions of fact involving either the spreading of the assessment or the validity of the assessment. That intention is expressed by the clear and unequivocal language of the statute—"no appeal . . . shall be had." So far, therefore, as the legislature had the power to do so, the decision of the tribunal in question was made final.

True it is, this court held upon the motion to dismiss this appeal that inasmuch as there was a constitutional provision guaranteeing to litigants a right to appeal in cases involving the legality of a tax, assessment, etc., the legislature had not the power finally to close and conclude by this provision all questions of law which might be involved in the proceeding to validate the assessment. (*In the Matter of a Proceeding to Validate Sutter-Butte By-Pass Assessment No. 6,* 190 Cal. 532 [213 Pac. 974].) But it was not intended by that decision to hold, nor did we hold, that *all* questions, irrespective of their nature and character, involved in the proceeding for the validation of the assessment, could be raised on appeal. [2] While the legislature did not have the power to deprive a litigant of the right to an appeal upon any question of law touching the validity of the assessment, it did have the right to forbid the consideration upon appeal of those questions of fact which involved the correctness of the apportionment of the assessment. The fact that the legislature did not have the power to make the judgment conclusive upon every question cannot, of course, be said to operate to deprive the legislature of the will and the power to make a judgment conclusive

upon those questions which in strictness do not trench upon the validity of the assessment.

[3] It is the rule generally in this and other jurisdictions that the legislature may, in its discretion, make the decision of a statutory board concerning the spreading of an assessment final and conclusive. And it has been held that the decision of such board is conclusive, except where an appeal is expressly provided by law. (*Larsen* v. *City and County of San Francisco*, 182 Cal. 1 [186 Pac. 757]; *Duncan* v. *Ramish*, 142 Cal. 686, 692 [76 Pac. 661]; *People* v. *Sacramento Drainage District*, 155 Cal. 373, 388 [103 Pac. 207]; *Ward* v. *Beale*, 91 Ky. 60 [14 S. W. 967]; *McDonald* v. *City of Escanaba*, 62 Mich. 555 [29 N. W. 93]; *Grand Rapids* v. *Welleman*, 85 Mich. 234 [48 N. W. 534].) The remedy of an appeal to some specified subordinate court may be provided for by the statute, but such a remedy is a matter of grace and not of right, and does not confer the privilege of having the judgment of the reviewing court again upon appeal taken to a court of last resort. (*General Custer Min. Co.* v. *Van Camp*, 2 Idaho, 40 [3 Pac. 22]; *Fulkerson* v. *Stevens*, 31 Kan. 125 [1 Pac. 261]; *Olympia Waterworks* v. *Board of Equalization*, 14 Wash. 268 [44 Pac. 267]; *Lawry* v. *Commissioners*, 12 Wash. 446 [41 Pac. 190]; *New York Cent. Ry. Co.* v. *Marvin*, 11 N. Y. 276.)

[4] The judgment of the superior court in the instant case was, in effect, dual in its nature, to the extent that it embodied a determination of the legal questions involving the validity of the assessment and the judgment of an equalization board concerning the spreading of the assessment. As to the former there was doubtless a right of appeal. (*In re Sutter-Butte By-Pass No. 6*, 190 Cal. 532 [213 Pac. 974].) But inasmuch as the legislature had the power to make the assessment final and conclusive had the assessment been equalized by an administrative board, it had the same power to make an equalization of the assessment final and conclusive when made by a superior court sitting, in effect, as an equalizing board.

It is no new practice for courts to take an active part in the levying of an assessment. It is held in some states that when acting in this dual capacity, the court is in reality two separate and distinct entities, a board of equalization and a

court having distinctly judicial powers. (*General Custer Min. Co.* v. *Van Camp, supra; Olympia Waterworks* v. *Board of Equalization, supra.*)  Other states hold that in acting as a board of equalization the court is acting solely as a court.  (*Matter of Canal & Walker Streets,* 12 N. Y. 406.)  But whether it be two separate bodies composed of the same members, or one body with different duties, the judgment of the court upon questions involving the benefit to be derived from the work and the apportionment of the assessment are matters of equalization and, therefore, are final and conclusive, when so provided by the legislature.

It is, however, maintained that the question of whether or not the land east of the by-pass, above contour 40, should have been assessed for the flood control benefit presents a question of law which appellants are entitled to have considered and determined by this court, and that it cannot be disposed of by saying that it relates merely to a question of the spreading of the assessment.  This may, for the sake of argument, be conceded.  The contention in this behalf is that this court by a long and harmonious line of decisions, culminating in *Gray* v. *Reclamation District, supra,* has determined that flood waters from streams like the Sacramento River are common enemy, against which each property owner may defend himself by protection levees, even though the result be to cast the water upon his neighbors, and that the only right which the neighbor has is to protect his own lands by the building of levees.  It is argued from this that inasmuch as the construction of the levees of Reclamation Districts 1500 and 1660, which are a portion of the entire flood control project, will cast the water upon the land of the east side owners above contour 40, which lands will be protected from inundation by the final completion of the project that these lands should have been assessed for flood control benefit, and that the action of the assessors in exempting these lands from the payment of a share of the assessment was purely arbitrary, and, as a matter of law, unjustified by the amendment of 1919 (Stats. 1919, sec. 2, p. 1126), which is undoubtedly the law under which the assessors proceeded.  As to this, appellants make two contentions: (1) that this amendment, properly construed, does not operate to exempt those owners, and (2), that if it is to be construed so as to exempt them, it is unconstitutional.  **[5]**  A mere

reading of the statute satisfies us that it was the intent and the definite purpose of the legislature by the amendment to exempt these lands from assessment for flood control benefit. [6] Nor is there any merit in the second objection for the reason that it is always competent for the legislature itself to determine the lands to be benefited, either by describing the same or by laying down a rule which serves to identify them and to determine the amount of the benefits accruing to those lands. Such determination is conclusive and not subject to review. This is upon the theory that the land owners themselves have had a hearing before the legislature in arriving at such determination by and through their representatives in the legislature. (*Tarpey* v. *McClure,* 190 Cal. 593 [213 Pac. 983]; *Flynn* v. *Chiappari, ante,* p. 139 [215 Pac. 682]; *Los Angeles County Flood Control Dist.* v. *Hamilton,* 177 Cal. 119, 123 [169 Pac. 1028]; *Miller & Lux* v. *Sacramento-San Joaquin Drainage Dist.,* 182 Cal. 252 [187 Pac. 1041]; *Reclamation District 108* v. *Evans,* 61 Cal. 104.) The only questions, therefore, remaining for consideration of this court upon this appeal are those relating to the validity of the assessment itself, and these are necessarily confined to those jurisdictional matters similar to those raised in cases where the assessment has been made by an administrative board and its validity assailed in a court of justice.

[7] It is the contention of appellants that the whole assessment was vitiated by the fact that after the assessment district was formed and a hearing with respect thereto had before the assessors, the reclamation board reduced the estimated costs of the project. Section 13 of the statute (Stats. 1913, p. 269) provides that the assessors must assess, upon all the lands within said drainage district proposed to be assessed for the plans adopted by the reclamation board, the sums included in the estimates of said board, and shall apportion the same according to the benefits that will accrue to each tract of land in said district, respectively, affected by any particular portion or project by reason of the expenditures of said sums of money. It further provides that "after said assessors have examined the plan or plans of work contemplated and the estimates of cost, they shall make a preliminary report to the Reclamation Board indicating the exterior boundaries of the lands that in their opinion will be benefited by the expenditures." No claim seems to

be made that there was any material change in the plans after the fixing of the exterior boundaries, but simply that inasmuch as the estimated cost of the project was reduced thereafter, the entire assessment must be thrown out, and thus the whole expensive and prolonged procedure of making and validating the assessment be re-enacted. The only step taken by the assessors before the estimate was reduced by the reclamation board was the establishment of the limits of the property benefited by the plan. The fixing of the limit necessarily was dependent upon the plan as proposed and not upon the estimated cost, for whether the estimated cost amounted to much or little, if the plans remained unchanged, the lands benefited would ordinarily be the same. [8] It is the plan of the project which forms the basis of the determination by the assessors of whether certain lands would or would not be benefited and, therefore, whether they should or should not be included within the proposed assessment district. [9] Inasmuch as the burden is upon the appellants to show error, it must be assumed that no material changes were made in the plans.

[10] Furthermore, even if changes may have been made in the plans, after the "preliminary report" of the assessors which, as required by the statute, contained a "general description" of the land which "in their opinion" would be benefited, it is evident from the language of the statute directing the assessors to make such a report fixing the boundaries, that the original determination of the boundaries was merely tentative, and subject to revision upon hearings held after the amendment of the plans. This being so, it cannot, we think, be said that the revision of the estimates of the reclamation board after the filing of the preliminary report by the assessors rendered the entire assessment a nullity.

The remaining objections involve the claim of various appellants who, it appears, did not file any objection to the assessment in the court below or otherwise appear therein in the validation proceedings. It is their contention that jurisdiction was not obtained over them or over their lands by the superior court in and for the county of Sutter. Admittedly the only service of process upon them was by publication as provided by the statute. (Stats. 1915, p. 1344, sec. 10, and Stats. 1919, p. 1093, sec. 5.) Judgment was

entered validating the assessment on the lands owned by them. Their appeal is prosecuted primarily upon the ground that the provisions of the validating statute providing for notice by publication violate the "due process of law" provisions of the state and federal constitutions. Incidentally in support of these particular appeals it is also argued that even if personal service could have been dispensed with, the published notice provided for by the statute was ineffectual, because it did not describe the lands or give adequate information to the land owners affected. And it is further insisted that the provision of the act in question, permitting service by publication, is special legislation.

In addition to the foregoing objections the contention is advanced in behalf of the appeal of Ella Hershey et al. that inasmuch as the action for the vadidation was commenced and carried to a conclusion in the county of Sutter, jurisdiction was never obtained over the last-named appellants, for the reason that the action is in the nature of a suit in equity to quiet title, and must be commenced in the county in which the land affected is situated. (Sec. 5, art. VI, Const.)

We will take up and dispose of these contentions in the order of their making.

[11]   In so far as the decision of the statutory court involved the correctness of the apportionment of the assessment there can be no question but that the notice given was sufficient to answer the requirements of due process of law, for it has become firmly established that in assessment cases notice may be by publication or otherwise. Indeed, no court proceedings at all are necessary, it being sufficient to satisfy the requirements of due process of law if a hearing has been had before the assessing board itself. (*Lent* v. *Tillson*, 72 Cal. 404 [14 Pac. 71] (approved by United States supreme court in *Lent* v. *Tillson*, 140 U. S. 316 [35 L. Ed. 419, 11 Sup. Ct. Rep. 825, see, also, Rose's U. S. Notes]); *States Sav. Bank* v. *Anderson*, 165 Cal. 437, 447 [L. R. A. 1915E, 675, 132 Pac. 755]; *Wulzen* v. *Supervisors*, 101 Cal. 15, 22 [40 Am. St. Rep. 17, 35 Pac. 353]; *United Real Estate etc. Co.* v. *Barnes*, 159 Cal. 242 [113 Pac. 167]; *Miller & Lux* v. *Sacramento-San Joaquin Drainage Dist.*, supra (writ of error dismissed by United States supreme court in *Miller & Lux* v. *Sacramento-San Joaquin Drainage Dist.*, 256 U. S.

129 [65 L. Ed. 859, 41 Sup. Ct. Rep. 404]) ; *Davidson* v. *Administrators of New Orleans,* 96 U. S. 97 [24 L. Ed. 616] ; *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. Notes] ; *Brown'* v. *Drain,* 112 Fed. 582.)  **[12]**  A notice by publication being sufficient to satisfy the requirements of due process if the hearing is before a statutory board, it is also sufficient where a court proceeding has been authorized.  If the assessment can be made a lien without personal service by action of a subordinate body, it can be made a lien by a court without personal notice.  (*Board of Directors* v. *Tregea,* 88 Cal. 334 [26 Pac. 237], citing *Lent* v. *Tillson, supra; Crall* v. *Poso Irr. Dist.,* 87 Cal. 140 [26 Pac. 797] ; *Mayo* v. *Ah Loy,* 32 Cal. 477 [91 Am. Dec. 595] ; *People* v. *Doe,* 36 Cal. 220 ; *Eitel* v. *Foot,* 39 Cal. 439 ; *Cullen* v. *Glendora Water Co.,* 113 Cal. 503 [39 Pac. 769, 45 Pac. 822, 1047] ; *Davies* v. *Los Angeles,* 86 Cal. 37 [24 Pac. 771] ; *Merchants' Trust Co.* v. *Wright,* 161 Cal. 149 [118 Pac. 517] ; *Fox* v. *Wright,* 152 Cal. 59 [91 Pac. 1005] ; *People* v. *Linda Vista Irr. Dist.,* 128 Cal. 477 [61 Pac. 86].)

**[13]**  We are of the opinion that the notice of the county clerk fixing the time for the objection to the assessment lists did give adequate information, by reference, to the land owners affected.  The notice was given that the assessment lists had been filed in the office of the clerk of the court before which the action was pending and that any person objecting thereto might appear and be heard in opposition to the assessment against his property as shown by these lists.  While this notice did not specifically describe the property, it must be borne in mind that this was not the only notice given to the land owners.  The statute itself specifically defined the boundaries of the drainage district and was notice to the land owners therein situated that in all probability their lands would be subjected to an assessment for the cost of the proposed improvements and thereby put them upon notice to watch the subsequent proceedings. The case of *Lent* v. *Tillson, supra,* is particularly in point. In that case it was held that a notice of the organization of the board and a notice that the report of the board was open to inspection was sufficient and adequate.  The court declared that it was to be presumed that the statute is known and that the sufficiency of the notice must be determined

from the particular circumstances of each case, and that in that case the statute, by informing the land owners beforehand of the course of procedure which would be followed and the notices which would be given, cast upon them the duty of exercising a certain degree of diligence in regard to them.

Furthermore, notice was given of a hearing before the assessors in the instant case to hear objections to the preliminary report fixing the boundaries of the proposed assessment district. In this notice was a general description of the lands which in the opinion of the assessors would be benefited, and it referred to the preliminary report on file in the office of the reclamation board for such exterior boundaries. In addition to this notice, the statute provides for a notice by publication of the hearing before the reclamation board to be published in each county wherein any of the lands assessed are situated. **[14]** No objection being urged here to the adequacy of the notices given of the hearing before the assessors and before the board of reclamation, their regularity and legality will be presumed.

The contention that jurisdiction by the superior court in and for the county of Sutter cannot be obtained over land in Yolo County is predicated upon the assumption that the present proceeding is in the nature of a suit in equity to quiet title. But to admit this assumption is to answer the contention. The constitution provides that "actions . . . quieting title to . . . real estate shall be commenced in the county in which the real estate, *or any part thereof*, is situated." **[15]** A drainage district, even though the lands embraced therein consist of several and separate parcels of land which extend over and into two or more counties, is in its very nature a single entity, and must be considered and treated as a unit extending to and embraced within the boundaries of the district. (*State* v. *Elliott*, 32 Ind. App. 605 [70 N. E. 397]; *Denton* v. *Thompson*, 136 Ind. 446 [35 N. E. 264].) **[16]** Conceding, therefore, that this is a suit in equity to quiet title to land situate in Yolo, Sacramento, and Sutter Counties, it follows that jurisdiction is given by the constitution to the superior court in and for the county of Sutter, the county in which the greater part of the land affected is situated. (*Kent* v.

*Williams,* 146 Cal. 3 [79 Pac. 527]; *Murphy* v. *Superior Court,* 138 Cal. 69 [70 Pac. 1070].)

[17]   We cannot concur in the contention that the provision in the act in controversy for service by publication is special legislation and violates the provision of the constitution which prohibits the legislature from passing special laws "regulating the practice of courts of justice." (Art. IV, sec. 25, Const.)   [18]   It is the rule generally that an act applying uniformly to any single class in its entirety, when the classification is founded upon some natural, intrinsic, or constitutional distinction, is not special legislation.   [19]   Of course, it will be conceded that the legislature is vested, primarily, with the discretion to make the classification and it has been repeatedly held that courts will not disturb a legislative classification unless it is palpably arbitrary in its nature and neither founded upon nor supported by reason, and the courts, generally, with the commendable purpose of upholding the constitutionality of a legislative enactment, when possible, are permitted to and do indulge in a liberal construction of an assailed statute.   (*Title etc. Co.* v. *Kerrigan,* 150 Cal. 289 [119 Am. St. Rep. 199, 8 L. R. A. (N. S.) 682, 88 Pac. 356]; *Sacramento etc. Drainage Dist.* v. *Rector,* 172 Cal. 385 [156 Pac. 506]; *People* v. *Sacramento-San Joaquin Drainage Dist.,* 155 Cal. 373 [103 Pac. 207].)   The law creating the Sacramento and San Joaquin Drainage District and the reclamation board stands, in many respects, in a class by itself.   This necessarily follows from the nature of the subject matter, which necessitates special law.   (*People* v. *Sacramento etc. Drainage Dist., supra.*)   [20]   We are of the opinion that the nature of the whole proceeding is sufficiently distinct and different from ordinary civil actions to justify the creation of a class for which special rules of procedure may be provided.

There is no merit in the final contention of appellants that the continuances were irregular and void.   [21]   The statutory court having acquired jurisdiction in the first instance by the filing of the assessment and by the publication of the notice required by the statute, retained jurisdiction of the proceeding pending the hearing by the supreme court of an application for a peremptory writ of prohibition.   It is conceded, as indeed it must be, that the alter-

native writ operated as a stay of proceedings and that as a matter of course the judges of the court below were powerless to do anything in the premises save to await the decision of this court determining the constitutionality of the act under which the court below was created and the proceedings provided therein permitted. This being so, it is manifest that the proceedings of the court below were continued by operation of law. In addition to this the court below, as a matter of caution, formally ordered the hearing of the validating proceedings continued from time to time until the prohibition proceedings were decided by this court, and then upon that decision coming down the court below gave notice by publication of the time set for hearing.

[22] The point that the orders for continuance were in some instances signed only by two of the judges does not seem to us to be possessed of much merit. The statute itself provides that the decision of a majority of the judges shall control, and that being so, we know of no good reason why a majority of the judges should not be permitted to make an effective order for a continuance of the hearing of the proceeding. [23] Nor do we think there is much merit in the contention that the order for a continuance was void because it was signed by one, or perhaps two, of the judges outside of the county in which the court was sitting. The order for a continuance relates to but a mere matter of procedure necessary to put the proceedings in a condition to be heard, and as such its validity was not impaired by the fact that it may have been signed outside the county in which the proceeding was pending. (*Comstock etc. Co.* v. *Superior Court,* 57 Cal. 625; *Walter* v. *Merced Academy Assn.,* 126 Cal. 582 [59 Pac. 136]; *Estudillo* v. *Security Loan Co.,* 158 Cal. 66 [109 Pac. 884].)

The judgment appealed from is affirmed.

Lawlor, J., Kerrigan, J., Seawell, J., Wilbur, C. J., Waste, J., and Myers, J., concurred.

Rehearing denied.

All the Justices concurred.