[L. A. No. 21052. In Bank. May 16, 1951.]

Guardianship of the Person and Estate of ALLIE WALTERS, an Incompetent Person. CHARLES BOBST et al., Respondents, v. ALLIE WALTERS SACKS, Appellant.

Bodkin, Breslin & Luddy, S. V. O. Prichard and Morris Lavine for Appellant.

Ralph R. Sleeper and Harold A. Slane for Respondent.

GIBSON, C. J.—Mrs. Allie Walters Sacks has appealed from an order declaring her incompetent and appointing respondent Rauch guardian of her estate and respondent Packard guardian of her person. She contends that the court lacked jurisdiction to make the order, that the evidence is insufficient to support it, and that the court erred in appointing Rauch as guardian of her estate because his interests were adverse to hers.

These proceedings were commenced in July, 1946, and various procedural and jurisdictional aspects of the case have been in the appellate courts on five separate occasions. (See *Sacks* v. *Superior Court,* 79 Cal.App.2d 806 [180 P.2d 922]; *Guardianship of Walters,* 81 Cal.App.2d 684 [184 P.2d 684]; *Sacks* v. *Superior Court,* 31 Cal.2d 537 [190 P.2d 602]; *Sacks* v. *Superior Court,* 88 Cal.App.2d 808 [199 P.2d 396]; *Guardianship of Walters,* 93 Cal.App.2d 208 [208 P.2d 713].) Appellant successfully evaded personal service until June 2, 1948, at which time she was regularly served with a citation requiring her to appear on June 11, 1948. When the matter was called on that date appellant was not present in court, and her attorneys objected to any proceedings being held in

her absence. One witness was asked two preliminary questions, and the hearing was recessed until June 14. A bench warrant was issued for appellant, and her attorneys were requested by the court to urge her to appear.

When the matter was called on June 14 the trial court was served with an alternative writ of prohibition issued by the District Court of Appeal restraining all proceedings until further order. The hearing on the petition for appointment of guardian was continued in open court from time to time until November 10, on which date the matter was ordered "off calendar." Thereafter the District Court of Appeal vacated the alternative writ of prohibition and denied a peremptory writ on the ground that the appellant could not defeat the jurisdiction of the superior court by refusing to respond to a citation which had been regularly served upon her. (*Sacks* v. *Superior Court*, 88 Cal.App.2d 808, 811 [199 P.2d 396].) A petition for hearing from that decision was denied by this court on January 20, 1949, and on January 24 the trial court directed that the hearing in the matter be resumed on February 7, 1949. No new citation was served on appellant, but the order fixing the date of hearing was served on her attorneys and she was present at the hearing and gave testimony.

Appellant contends that she has been denied due process of law because evidence was taken in her absence when the matter was first called on June 11, 1948. This contention is entirely without merit. After having been regularly served with a citation directing her to appear she wrote to a newspaper stating, "I will not appear in court and I am leaving California, I hope for good." She later advised her attorneys that she was out of the state and would not be present at the hearing. There was no showing that she was unable to be present when the matter was called for hearing, and no excuse was given for her absence. The essentials of due process were fully met, and the court had jurisdiction to proceed. (See *Chaloner* v. *Sherman*, 242 U.S. 455, 461 [37 S.Ct. 136, 61 L.Ed. 427]; *Sacks* v. *Superior Court*, 88 Cal.App.2d 808-812 [199 P.2d 396].) Not only was there compliance with the requirements of due process, but the record shows that appellant's interests were scrupulously protected by the trial court. Notwithstanding appellant's disobedience of the order to appear, the court was unwilling to proceed in her absence and recessed the matter after only two preliminary questions had been asked of one witness.

These questions and the answers thereto were repeated in substance in appellant's presence when the hearing was resumed in February, 1949.

The next contention is that the court below lost jurisdiction over the person of appellant on November 10, 1948, when it ordered the guardianship matter off calendar pending determination of the prohibition proceeding. █ It should be noted as a preliminary matter that appellant's presence and participation when the hearing was resumed in February, 1949, do not preclude her from raising the jurisdictional question, since a person who is alleged to be incompetent is incapable of waiving statutory requirements of notice. (*Snyder* v. *Superior Court*, 206 Cal. 346, 349-350 [274 P. 337]; *McGee* v. *Hayes*, 127 Cal. 336, 338 [59 P. 767, 78 Am.St.Rep. 57].)

Appellant argues, in effect, that the off-calendar order amounted to a dismissal and that, since no new citation was served on her, the trial court was without power to proceed with the hearing or to declare her incompetent.* █ While it is true that a court cannot properly proceed in such a case when the matter has been dropped from the calendar, unless, upon restoration to the calendar, notice is given of the time and place of hearing, we cannot agree that another service of citation was essential. An off-calendar order is not equivalent to a dismissal and does not divest the court of the jurisdiction which it has acquired. (*Guardianship of Lyle*, 77 Cal.App.2d 153, 155-156 [174 P.2d 906]; *Bankers Trust Co.* v. *District Court of Hamilton County*, 209 Iowa 879 [227 N.W. 536]; *Hart* v. *Challerton*, 216 Mass. 90 [102 N.E. 929]; *Jasperson* v. *Jacobsen*, 224 Minn. 788 [27 N.W.2d 788, 793]; see *California C. Mach. Co.* v. *Superior Court*, 3 Cal.2d 606, 609 [44 P.2d 1046]; *Gury* v. *Gury*, 219 Cal. 506, 509 [27 P.2d 758].)

█ Nor does a different result follow by reason of the issuance of the alternative writ of prohibition which directed the trial court to refrain from taking any further proceedings in the matter. It has been held that such a writ amounts to a stay of proceedings by operation of law pending determination of the application for a peremptory writ. (*In re*

---

*Section 1461 of the Probate Code provides that, upon the filing of a petition for appointment of a guardian for an alleged incompetent, the clerk shall issue a citation directed to the alleged insane or incompetent person setting forth the time and place of hearing and that the citation must be ''personally served'' on said person ''at least five days before the time of hearing.''

*Sutter-Butte By-Pass Assess. No. 6,* 191 Cal. 650, 671-672 [218 P. 27].) After service of the alternative writ it would, of course, have been improper for the trial court to act contrary to its terms. However, the orders which continued the matter from time to time and then removed it from the calendar were not contrary to the writ but were entirely consistent therewith and did not have the effect of a dismissal. (See *George L. Cousins Contracting Co.* v. *Acer Realty Co.* (Mo.App.), 110 S.W.2d 885, 889.) ▮ Moreover, for purposes of this appeal the orders may be regarded as surplusage since, as we have seen, the alternative writ by operation of law postponed proceedings to an indefinite date. (See *In re Sutter-Butte By-Pass Assess. No. 6, supra,* 191 Cal. at p. 672; *George L. Cousins Contracting Co.* v. *Acer Realty Co.* (Mo.App.), *supra,* 110 S.W.2d at p. 889.)

▮ Inasmuch as the proceedings were not dismissed, there was no need for another service of citation on appellant. Her attorneys were given adequate notice of the date set for resumption of the hearing, no further notice was required by law, and she appeared at the appointed time with her counsel and gave testimony.

▮ In considering appellant's contention that the evidence does not support the finding of incompetence, we must test the evidence in the light of Probate Code, section 1460, which provides: ". . . the phrase 'incompetent person,' 'incompetent,' or 'mentally incompetent' shall be construed to mean to refer to any person, whether insane or not, who by reason of old age, disease, weakness of mind or other cause, is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons."

▮ All conflicts and any reasonable doubt as to the sufficiency of the evidence must be resolved in favor of the order. (See *Estate of Reed,* 198 Cal. 148, 151 [243 P. 674]; *Estate of Bristol,* 23 Cal.2d 221, 223-224 [143 P.2d 689].) In cases of this type, as in any other, we must uphold the findings of the trial court if there is any substantial evidence which, together with the aid of all inferences reasonably to be drawn from it, tends to support the judgment. (*Matter of Coburn,* 165 Cal. 202, 212-213 [131 P. 352]; *Estate of Reed, supra,* 198 Cal. at pp. 150-151; *Estate of Watson,* 176 Cal. 342, 346 [168 P. 341]; *Estate of Schulmeyer,* 171 Cal. 340, 342 [153 P. 233]; *Guardianship of McConnell,* 26 Cal.App.2d 102, 106-107 [78 P.2d 1043].)

Appellant was widowed in 1940 at the age of 72. Her husband left her property worth between $300,000 and $400,000, which included 18 or 19 pieces of improved realty and produced a net income of approximately $2,000 per month. She owned her own home, where she lived with a brother, and managed her various properties with the assistance of her brother-in-law. In April, 1944, when she was 76 she met Earl Sacks, an oil promoter, who was then 53. He began paying marked attention to her, introduced her to his friends, and the following month induced her to buy some property from third persons by means of an escrow transaction out of which he made a sizable profit at her expense and unknown to her. He told her that he was worth "millions" in oil lands and that he had a valuable gold mine. The record does not disclose what property he owned or what its value may have been. It appears, however, that the oil properties he claimed to own had not been developed and that he had little, if any, money. Between May and August Sacks obtained several thousand dollars from appellant, part of the sum representing money she had borrowed on her property.

In September, 1944, they went to Las Vegas and were married. Between that time and February, 1945, appellant borrowed large sums of money on her properties on several occasions, and Sacks appropriated the proceeds of the loans to himself. At his suggestion she put all her property into joint tenancy with him, and they kept a joint bank account. Sacks spent some $20,000 of appellant's money buying a home and luxuries for a former wife and son. In all, he cost appellant approximately $60,000 in the five or six months they lived together immediately after their marriage.

When appellant discovered evidence of Sacks' mishandling of her money, in February, 1945, she left him and told her story to the district attorney. Subsequently she testified before the grand jury, and in May, 1946, Sacks was indicted on seven counts of grand theft and one count of corporate securities violation arising out of his dealings with her property. Appellant, meanwhile, filed suits for annullment, for divorce, and to have a resulting trust imposed on the home Sacks had bought for his ex-wife. Thereafter appellant had a change of heart, forgave Sacks, and put up bail to have him released. They went to Mexico together, she failed to appear at his trial, and the criminal case against him was dismissed

for lack of prosecution on July 26, 1946. None of the civil actions commenced by her was brought to trial.

It was at this time that the present guardianship proceeding was commenced by appellant's brother, Charles Bobst. Appellant, having returned from Mexico with Sacks, again left the state in order to avoid service of citation. In August, 1946, she was adjudged incompetent, and a guardian was appointed to manage her estate, but the order was subsequently annulled as void for lack of service. (*Sacks* v. *Superior Court*, 79 Cal.App.2d 806 [180 P.2d 922] ; see, also, *Guardianship of Walters*, 81 Cal.App.2d 684 [184 P.2d 684].) An attorney who had been appointed appellant's guardian *ad litem* in the proceedings went to Missouri, where appellant and Sacks were living together, and tried unsuccessfully to influence her to return to California and appear in court. The attorney requested Sacks to leave the room while he conferred with appellant, but Sacks remained present throughout the interview.

On another occasion appellant's sister and brother-in-law went to Missouri to see her and urged her to return to California with them, but she refused. For some two years she and Sacks lived in hotels and motels in various states. It was not until June, 1948, that service could be had on her in California, at which time she was found living under an assumed name in a small resort town. Upon being served, as we have already seen, she wrote to a newspaper stating that she would not appear in court and then refused to be present on the day set for commencement of the hearing in June, 1948. She did appear, however, when the hearing was resumed in February, 1949.

A psychiatrist testified that, in his opinion, appellant suffers from cerebral arteriosclerosis and "has been, at least since 1944, and is at this time incompetent." Appellant took the stand, and on direct examination her testimony was clear and her memory for financial detail excellent. On cross-examination, however, she was evasive and forgetful as to transactions in which Sacks had mishandled her money and as to her testimony before the grand jury which led to his indictment. She testified that she had not recovered any of the property Sacks had given to his former wife and had not pressed the suit she had filed in June, 1946, to impose a trust thereon, but that she would take care of the matter "when the proper time comes." Appellant stated that from time

to time her attorneys advised her to appear in the guardianship proceedings but that she used her ''own judgment in all' cases'' and avoided service of citation because she was afraid of being placed ''in some institution.'' She said, however, that she did not remember ever having asked any of her attorneys about the possibility of being committed to an institution.

Appellant complains that the foregoing evidence is insufficient to support the finding of incompetency, claiming that the psychiatrist's testimony should be disregarded and that the evidence relating to facts occurring between 1944 and 1946 was too remote. It is asserted that the psychiatrist did not understand the legal meaning of the term ''incompetence'' and that the facts upon which he based his opinion did not justify his conclusion. During a series of preliminary questions the psychiatrist testified that he was familiar with section 1460 of the Probate Code relating to incompetency. When asked by respondents to define incompetence he replied that it is ''a state of the human being in which this human being can be taken advantage of by artful and designing persons and is unable to manage her or his own estate for that reason.'' Appellant did not challenge the witness' definition or cross-examine as to it, but she now complains that it is at variance with the code section and indicates that he must have based his conclusion as to her incompetence upon the fact that she had already been imposed upon by an ''artful or designing'' person. While the psychiatrist's definition is incomplete, his testimony as a whole clearly shows that he took the proper elements into account in forming his opinion as to appellant's incompetency, namely, her age, her state of health and her mental condition. Further, it should be noted that the witness' attention was at no time directed to the language he had used in his definition, and he was given no opportunity to amend or clarify it.

The psychiatrist's opinion as to appellant's competency was based on his observation of her, his study of two transcripts of testimony given by her in other proceedings in 1945, and a lengthy hypothetical question. The witness had not examined appellant but had observed her in the courtroom on three different occasions at which times he noted that she had a marked tremor of the head. He stated that this was a ''positive indication'' of hardening of the arteries, that the condition had an effect on reasoning powers, and that the prognosis for a woman of her advanced age was not good.

He further stated that, in his opinion, her testimony as it appeared in the two transcripts indicated that she was "uncertain," "confused," and that "her memory is not too good." Although it is apparent that the witness' opinion would carry more weight if it had been based on an examination of appellant, we cannot say as a matter of law that the facts and circumstances he took into consideration do not justify his conclusion. It should be noted that, while appellant produced two other psychiatrists and her family physician who testified that she was able to manage her own affairs, two of these experts stated that she had a tremor, and one of them testified that a tremor might be an indication of arteriosclerosis.

We cannot agree with appellant's contention that evidence of facts occurring between 1944 and 1946 was too remote to be considered on the question of her competency at the time of the hearing in February, 1949. Evidence of conduct tending to show mental condition a reasonable time before the hearing is admissible on the question of competence (*Matter of Coburn*, 165 Cal. 202, 213 [131 P. 352]; *Estate of Reed*, 198 Cal. 148, 150 [243 P. 674]), and broad discretion is left to the trial court as to the character of such testimony and the period of time over which it may extend. (*Estate of McKenna*, 143 Cal. 580, 586 [77 P. 461]; *Estate of Baker*, 176 Cal. 430, 437-438 [168 P. 881]; *Estate of Martin*, 170 Cal. 657, 663 [151 P. 138].) In any event, the trial court's finding of incompetency was not based solely on evidence of facts occurring before July, 1946. Appellant's conduct from the date of her reunion with Sacks in 1946 up to and including the time she appeared and testified at the hearing is some evidence of her mental condition which the court could and apparently did take into consideration in making its determination. In addition the trial judge was entitled to consider appellant's behavior on the stand. He observed her and the manner in which she testified at the hearing and was in a better position than we are to pass upon her mental condition. (See *Estate of Cowper*, 179 Cal. 347, 348-349 [176 P. 676]; *Estate of Schulmeyer*, 171 Cal. 340, 343-344 [153 P. 233]; *Estate of Coburn*, 165 Cal. 202, 214-217 [131 P. 352]; *Guardianship of McConnell*, 26 Cal.App.2d 102, 106 [78 P.2d 1043].)

Appellant argues that she has conclusively demonstrated her competence to manage her own property by the

facts that she has employed a reputable real estate company to assist in caring for her realty, that she had the joint tenancy agreement with Sacks set aside and that she has not kept a joint bank account with him or borrowed on any of her property since their reunion in 1946. Such matters, however, merely serve to create a conflict in the evidence, and considering the record as a whole, we are satisfied that there is sufficient support for the finding of incompetency.

The cases of *Guardianship of Waite*, 14 Cal.2d 727, 731 [97 P.2d 238], and *Estate of Watson*, 176 Cal. 342 [168 P. 341], relied on by appellant, are not controlling. There the evidence which was held insufficient to show incompetency related to poor business judgment and marriage to a much younger man which resulted in considerable financial loss. Here we not only have evidence to that effect, but we also have medical testimony that appellant, who was approximately 82 years old at the time of the trial, is suffering from arteriosclerosis, shows signs of physical and mental deterioration, and is incompetent. Further, unlike the situation in the Waite case, the trial court had an opportunity to observe the alleged incompetent's demeanor on the stand. Moreover, in passing upon appellant's ability to manage her affairs, the court might properly have attached some significance to her conduct in leaving her home and traveling around in order to evade service, repeatedly ignoring the advice of counsel to appear in court, and defying the citation to appear when it was eventually served on her.

We must next determine whether the trial court abused its discretion in appointing respondent Rauch as guardian of appellant's estate. Rauch had previously been appointed guardian of her estate under the void order of August, 1946, and he managed her properties until the order was set aside. Shortly thereafter appellant filed suit against Rauch and other persons charging them with mismanagement of her property and with oppression and malice. She claims that Rauch's interests are adverse to hers because of this suit, which is still pending and has not yet been brought to trial on the merits, and that for this reason it was error to appoint him as guardian.

It is true that the positions of guardian of a ward and defendant in a suit brought by the ward are antagonistic, and that Rauch cannot properly represent appellant in the action brought by her against him as an individual. (See

*Townsend* v. *Tallant*, 33 Cal. 45, 52 [91 Am.Dec. 617];
*Loock* v. *Pioneer Title Ins. etc. Co.*, 4 Cal.App.2d 245, 249
[40 P.2d 526]; *Rupe* v. *Robinson*, 139 Wash. 592 [247 P.
954, 47 A.L.R. 565, 567].) However, the mere exist-
ence of the pending action did not disqualify Rauch from
acting as guardian of appellant's estate, since her interests
in that action could be adequately protected by the appoint-
ment of a guardian *ad litem.* (Prob. Code, § 1607; Code Civ.
Proc., §§ 372, 373; *Townsend* v. *Tallant, supra,* 33 Cal. at
p. 52; *Loock* v. *Pioneer Title Ins. etc. Co., supra,* 4 Cal.App.2d
245, 249; *Boyd* v. *Lancaster,* 56 Cal.App.2d 103, 109 [132
P.2d 214]; *Rupe* v. *Robinson, supra,* 139 Wash. 592 [247
P. 954, 47 A.L.R. 565].) There was abundant evi-
dence that Rauch was well qualified to handle the property,
there was no proof of mismanagement, oppression or malice,
and we cannot say that the trial court abused its discretion
in finding that he was a suitable, fit and proper person to be
appointed as guardian.

 Appellant also appeals from an order made on
April 22, 1949, pursuant to Probate Code section 1631,*
directing Rauch to take possession of her property pending
appeal from the order declaring her incompetent. There-
after, on July 30, 1949, she obtained a writ of supersedeas
from the District Court of Appeal staying action by the
guardian pending determination of the appeal from the
incompetency order. (*Guardianship of Walters,* 93 Cal.
App.2d 208 [208 P.2d 713].) As grounds for reversal of
the order directing the guardian to take possession, appellant
asserts that there is no evidence that the order was necessary
"for the purpose of preventing injury or loss to person or
property," as required by section 1631. The appeal was
taken on a clerk's transcript alone, and appellant did not
produce a certified reporter's transcript or make any appli-
cation to be relieved from default for failure to request a
reporter's transcript within the time required by the Rules
on Appeal. (Rules 4, 53.) In this state of the record we

---

*Section 1631 of the Probate Code provides that "An appeal from
an order appointing a guardian for an insane or incompetent person shall
stay the power of the guardian, except that, for the purpose of prevent-
ing injury or loss to person or property, the court making the appoint-
ment may direct the exercise of the powers of the guardian, from time
to time, as though no appeal were pending, and all acts of the guardian
pursuant to such directions shall be valid, irrespective of the result of
the appeal."

must presume that there was sufficient evidence to support the order. (*Guardianship of Waite,* 33 Cal.App.2d 315, 316 [91 P.2d 620].)

There is no merit in appellant's contention that the decision in the supersedeas case (*Guardianship of Walters,* 93 Cal.App.2d 208 [208 P.2d 713]) is determinative of the present appeal. That decision was made on demurrer to an application for supersedeas which incorporated various petitions and affidavits submitted to the trial court, and it was necessarily limited to a holding as to the sufficiency of the evidence set forth in that application. Appellant claims that it was there held that the evidence before the trial court did not show reasonable necessity for the order, but it does not appear that the District Court of Appeal had before it all the evidence which was before the trial court. Respondents claim that there was additional evidence, the opinion does not negative the possibility of such evidence, and the order of the trial court recites that it was made "after receiving evidence, considering affidavits submitted, and reviewing the record of this matter." Under the circumstances, the supersedeas decision is not controlling.

The orders are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied June 14, 1951.