[Civ. No. 7315. First Appellate District, Division One.—February 20, 1931.]

JOE BLATTMAN, Respondent, v. PETER R. GADD et al., Appellants.

Butler, Van Dyke, Desmond & Harris for Appellants.

Theodore W. Chester for Respondent.

PARKER, J., *pro tem.*—The plaintiff, a land owner and taxpayer within Reclamation District No. 1001, brought this action on behalf of himself and others similarly situated. The purpose of the action was to have declared null and void and to rescind a certain contract of employment entered into between the trustees of Reclamation District No. 1001, on behalf of said district, and appellant Charles F. Metteer. Further, plaintiff sought, as part of the relief necessarily incident to the cancellation of the contract, the return to the Reclamation District of certain outstanding warrants delivered to Metteer, a number of which warrants had been assigned to appellant Gadd.

All of the defendants appeared and answered and upon issues joined, trial was had. The Reclamation District strenuously contested the claims of plaintiff throughout the trial. However, before decision in the lower court, there seems to have been a re-adjustment in the affairs of the district, resulting in the election of a new board of directors, or at least the election of sufficient new members to change the policy of the said board. Thereupon the Reclamation District, and the directors as well, caused to be filed amended answers, wherein was adopted the theory of the plaintiff, and the district and the directors asked that judg-

ment be entered in conformity with the prayer of the plaintiff. The judgment that followed was in favor of plaintiff and the defendants Gadd and Metteer prosecute this appeal. Each of the named appellants appears separately and with separate counsel. There is one strange feature of the appeal and it is that each appellant, in greater or lesser part, urges the arguments advanced by counsel for the remaining defendants at a time when the position of the said defendants had not become unfavorable to the cause of the present appellants. This is mentioned merely in passing. It is perhaps axiomatic that sound law remains sound, irrespective of its source. Many reasons are advanced to overthrow the judgment and the case has been exhaustively briefed. In intelligent discussion of the points raised, it becomes necessary to review the facts surrounding the entire case.

Reclamation District No. 1001 is one of the agencies created and existing pursuant to the general plan of reclamation and flood control, as outlined in a series of legislative enactments reviewed and cited in the case entitled *"In re Sutter-Butte By-Pass Assessment No. 6 of the Sacramento and San Joaquin Drainage District"*, reported in 191 Cal. at page 650 et seq. [218 Pac. 27]. The case cited is an instructive treatise on the creation, aims and objects of reclamation districts, as existing under our law and a reference thereto will serve in lieu of any general or special review here. Reclamation District No. 1001 was created and exists under an act of the legislature found in statutes of 1911 at page 831. This district and the lands embraced therein form a portion of the entire territory coming within that assessment district formed by the state reclamation board and designated "Project No. 6", which said project had for its main purpose the building of the Sutter-Butte By-Pass. This assessment district embraced within its area some 500,000 acres. The details of project No. 6, as well as its general purpose, will be found in the cited case. The west line of District No. 1001 forms a portion of the east line of project No. 6, and as an integral part of the reclamation and flood control contemplated in the general plan of the said project, it was proposed and found necessary to reconstruct and raise the levees forming the said boundary line. The entire cost of project No. 6 was estimated at some $8,000,000 and the total assessment against

the lands embraced within District No. 1001 amounted to $131,154.58. It was estimated in project No. 6 that the cost of reconstructing the levee on the boundary referred to would be $40,500 and in the validation proceedings, subsequently approved by the courts, as noted, said amount was assessed against the lands of District No. 1001 for the construction of the levee.

There had been negotiations between the state reclamation board and District 1001 over an extended period prior to the adoption of project No. 6 in which negotiations the sole object of concern was the enlargement and alteration of the particular levee of the district. It will suffice the present needs, however, to begin our discussion and consideration at the point when and after project No. 6 had been finally adopted and the assessment thereunder validated. The trustees of the district, as well as the members of the state reclamation board, had determined that the district was better equipped to undertake the work contemplated by the project within the district. Accordingly, it was agreed between the board and the district that the latter should proceed and complete the alteration and rebuilding of this levee under the plans of project No. 6. It is understood that throughout this opinion all reference to the levee is restricted to the work done within the boundaries of District No. 1001. After the work had been commenced it was found that conditions existing required improvements far beyond those contemplated or upon which estimates had been based. Without detail, when the work had been completed, it was found that the cost was in excess of $160,000 as against the original estimate of $40,500. Incidentally, it might be noted that the actual cost of the entire project was far in excess of the original estimates. When the work was completed and the additional cost determined the question then uppermost was that of reimbursement to the district. Detailed statements were prepared and all expenditures were analyzed and confirmed; this from both an accounting and an engineering standpoint. A complete analysis of the work having been completed, with vouchers and engineering data obtained in support thereof, the district presented to the state board its claim in the amount and sum of $142,634.99.

From this point we begin to turn into the field of disputed fact. It is not our purpose nor is what follows intended to reflect that state of fact upon which all sides concur. Necessarily, however, we confine ourselves to the record and as is usual and compulsory we accept the facts as found or assume that finding, in case of conflict of fact which supports the judgment. It may be further noted that except in more or less minor details no real conflict appears. It is at this period, or thereabouts, that defendant and appellant Metteer enters into the transaction. Metteer was and is an attorney at law. While engaged in general practice he has, to a large extent, specialized in that branch of the law peculiarly affecting reclamation and reclamation boards and districts. In this practice he has acquired an extended and intimate acquaintance, not only with the procedure involved but also with the administrative officers engaged in this work. While he has never been under regular or permanent retainer or employment by District 1001 yet the fact is that from time to time, as occasion required, he did attend to such matters as might necessitate the employment of counsel. When it was found that the reclamation board, after presentation of the claim, seemed to be taking no action toward the consideration thereof, the trustees of the district again turned to Metteer for aid and advice. After consultation it was arranged and agreed that Metteer should be retained and he was retained as counsel for the district to attend to the presentation and collection of the claim then pending before the state board. At the time of this employment it seems conceded that all of the required data, both engineering and accounting, had been gathered and compiled and that very little, if any, further work was necessary in this connection. Upon review of this data it was decided to amend the claim which had been presented; the amendment being principally in amount. The amended claim was for the sum of $157,-356.27, with an additional amount of some $20,000, claimed due as interest upon the moneys advanced. This claim was filed October 11, 1923, and on October 20th of the same year there was filed by the district a supplemental claim for some $7,600, including an item of $1,264.21 alleged to be due as interest. Thus it will be noted that the claim as finally made was for something in excess of $185,000. From

the time of the first presentation of the original claim to October of 1923 little, if anything, was done as to urging the claim before the board; the district and its directors and counsel apparently being content with the priority resulting from the date of filing. As will hereinafter appear, however, there seems to have been much personal discussion with individual members of the state board and though these discussions were more or less frequent, yet formal action on the claim was deferred and time went on with no indication or promise of early action.

At this juncture we bring defendant and appellant Gadd into the discussion. Gadd, from February up to and including August 22, 1923, was one of the members of the state reclamation board and was at all of these times an active member, being for some portion of the period stated the secretary. From the record before us and the testimony of Gadd it is readily apparent that he was a controlling factor in the board's policies and actions. Prior to his appointment on the board, Gadd had been a civil engineer of extended practice, specializing, to a great degree, in flood control, drainage and construction. In August, 1923, shortly after Gadd's retirement from the board, there transpired the events going to constitute the controversy here. In the further detail leading up to the present action no effort will be made to attain strict chronological accuracy inasmuch as this detail is useless.

During the pendency of the claim before the board, Metteer was a frequent visitor at the board offices. It seems that Metteer had his office in the same building and was in and out on business with the board or its executives as frequently as twice a week throughout the period. Many informal discussions were had regarding engineering details and other matters. During this period Gadd became quite intimate with the matter of the pending claim, though not acquainted with the detail. Immediately upon Gadd's resignation (and some evidence indicates or at least supports the inference that prior thereto) he took up with Metteer the question of his, Gadd's employment in presenting the claim for action. At this juncture, in connection with the question of Gadd's employment, there arose, quite in order, the question of compensation, both as to Metteer and Gadd. It developed, after some consultations and discus-

sions between Metteer and the trustees of the district, that the latter did not desire to enter into any contract with Gadd, but thought it more advisable to contract directly with Metteer, leaving the compensation of Gadd to be a matter of contract between himself and Metteer. Accordingly there was drawn up the contract which brought the controversy now before us. The trustees agreed with Metteer that he should present the claim and as compensation for his services should be compensated, contingent upon his success, from the amount recovered. On all sums up to and including $40,000 Metteer was to receive twenty per centum of the amount allowed, and upon all sums over and above that amount he was to receive fifty *per centum*. Thereupon Metteer contracted with Gadd to pay to the latter seventy-five *per centum* of all amounts received by Metteer, out of the amount Metteer received from funds over $40,000, and fifty *per centum* of the amount received from the funds under that sum. Thereafter a hearing was arranged before the state board for October 23, 1923, which was just twenty-three days after the date of the agreement between the district and Metteer, and the agreement between Metteer and Gadd. On October 24, 1923, the claim was allowed for $160,802.39 and warrants issued for the payment thereof. It is unnecessary to dwell upon the species of warrant. Suffice it to say the warrants were in regular form, drawn upon the state treasurer and payable out of the Sutter-Butte By-Pass fund. On October 25, 1923, the district indorsed and turned over to Metteer, warrants of the face value of $68,401.19 and Metteer turned over to Gadd a portion of these to the extent of $50,000.

As stated hereinbefore, this action was instituted by the plaintiff as a taxpayer within District 1001 to set aside the transaction, declare the agreement null and void and have returned to the district the warrants thus delivered to Metteer, and by the latter to Gadd. The trial court rendered judgment as prayed and fixed the value of the Metteer service at $1500. The foregoing facts will be supplemented as we take up the various contentions presented.

The main theory of the respondent is to the effect that the contract referred to is unreasonable, unconscionable and in substance amounts to a waste of the funds of the district and that by reason of this taint it is a contract that the

trustees of the district had no power to enter into. Further, that the law governing districts of this character especially enjoins such use of the warrants received. The chief argument of both appellants is an attack upon this theory of respondent, it being evident from the findings and the judgment of the trial court that this issue was the prevailing one at the trial. Before approaching a discussion of this most important feature of the case, there are certain other contentions that may be here taken up and disposition thereof made. ■ It is contended by both appellants that the plaintiff, as a taxpayer within the district, is not competent to maintain the action upon the facts related. This contention is advanced under many theories, including the nature of the contract and the discretion vested in trustees of such a district. However, it appears from the record before us that prior to judgment the pleadings were so amended that the defendant district and the defendant trustees thereof, or at least a majority of them, joined with the plaintiff in the relief asked, so that in effect, as the controversy eventuated, the issues joined were between the district and the appellants. True, it is urged, that the cause still remained the same. The plaintiff taxpayer remained the actor throughout, but the condition existing, which gave to the taxpayer his right to maintain the suit at all, was the fact that the trustees of the district refused to act and his status was practically that of a minority stockholder whose suit was to recover, not for himself, but for the corporation or district whose rights were being lost through neglect of the trustees. Therefore, when the district acquiesced in the claim of the plaintiff, that the district had been defrauded or its funds dissipated and assumed the duty, properly chargeable to them as trustees, the plaintiff had accomplished the purpose of his suit, namely to have inquiry made and the claim of restoration urged. It would follow then that the question of plaintiff's right to maintain the action has become purely academic and under the changed pleadings has become moot. No further consideration need be given this point.

Other points raised involve the question of mistake, as a ground for rescission, and a ratification after mistake disclosed. These points, too, become more or less beside the main question and not deserving of minute discussion. We

might concede that the mistake claimed, as will hereinafter appear, would not of itself be sufficient to declare ineffectual the contract, but evidence concerning the same would be relevant and material, as an aid in disclosing the situation of the parties at the time of contracting. ▉ Also the question of ratification requires little notice for the reason that if the contract is of the character claimed by plaintiff and found by the court, it could not be ratified; if it were free of the taint charged its validity would not be questioned and ratification would be surplusage. This brings us then to what we deem the essential point in the case, namely, the question of unconscionableness, coupled with the power of the trustees to enter into the contract, if found to be unconscionable and oppressive.

▉ At the trial the court admitted evidence concerning the original assessment of benefits, and likewise the court permitted testimony on the benefits and assessments to follow and as to where the burden would fall for payment of the excess amount over the original estimate of $40,500. Upon the evidence thus received, the court found that the surcharge or extra cost would be properly chargeable against the district and, upon a reassessment, the district and the lands embraced therein would have to bear the additional burden. It was the trial court's conclusion that upon reassessment the district would have to pay the additional charge of collection, as well as the difference between $40,500 and the claim allowed of some $160,000. Appellants urge this to be error and error of such a serious nature as to vitiate the judgment, in that both the admission of the evidence objected to and the finding of the court thereon operate to the prejudice of appellants and constitute a grave misconception of the law applicable. It is the claim of the appellant that the original assessment and the proceedings validating the same fixed, once and for all, the proportionate liability of each district within project No. 6 and that all future liability or future assessments or reassessments in completion of the project must automatically follow in the same proportion. In other words, and by way of illustration, if the entire cost of project No. 6 was $8,000,000 and the benefits accruing to District 1001 were determined and fixed in the original assessment at $1,000,000, it would be obvious that the proportionate share of the project to be

borne by the district would be one-eighth. Applying this theory, appellants contend that the construction or reconstruction of the levee in District 1001 was a part of the general project and that while a definite sum was allocated to and assessed against the lands of the district, the sum so named was an allocation proportionate to the entire project and that when the cost went above the estimate the surplus was to be, and by law was required to be, borne by the entire project.

Appellants have diagramed the mathematical conclusions to be drawn from this theory, from which it appears that the liability of the district would be in a small amount and that while the amounts paid Metteer might appear gross, yet in reality the cost to the district or the lands therein would be assessed only to a perhaps negligible extent. Urging the importance of this contention, appellants argue that the trial court was guided wholly by the size of the sum paid Metteer in so far as it affected the district, and that if the trial court had correctly approached the subject and found, as the law compelled the finding, the slight cost to the district, then the trial court would have had no basis from which it could conclude the contract to be unfair or unconscionable. We do not feel that the question is as important as appellants would have it appear. Without reviewing the authorities cited by appellants it is manifest that the same question has never been before the courts of this jurisdiction. While we do not feel called upon to decide just how any future assessments or reassessments must be allocated or levied we might point out wherein the contentions of appellant would be an independent question for subsequent determination, first by the levying power of the state.

In the validation proceeding hereinbefore referred to and found reported in *In re Sutter-Butte By-Pass Assessment No. 6, supra,* the Supreme Court holds that the matter of assessments of the nature here under consideration is essentially a question of fact and proceedings to that end are purely statutory and almost summary. Without expressly deciding the point, it being unnecessary to this controversy, it could well be that proceedings upon reassessment would permit the charge of the surplus under project No. 6 to the particular units wherein the excess accrued, upon a showing

of excess cost in materials or work exclusively for the benefit of such units.

There is in the record before us much evidence to support the claim of respondent, that the levee constructed on the boundary of the district was essentially a part of the reclamation work of the district, as well as being a portion of the general scheme involved in project No. 6. The question of this levee and its reconstruction had been before the state board before the determination to undertake the general project, and was then approached as a distinct district improvement. Much of the work of preparing and enlarging the levee, so as to fit it for the general improvement, embraced repair of the then existing conditions. And the state board in fixing the benefits accruing, determined not that the amount assessed was the fair proportion, compared with benefits, that should be borne by the district, but that the construction of this particular portion of levee was for the benefit of the district and the cost thereof should be borne by it alone. The benefit determined was not such benefit as would accrue from an expenditure of any sum of money, proportionate or otherwise, but the benefit that would accrue from the reconstruction of the levee, the cost of which was fixed merely by way of estimate. It would seem in keeping with the theory of assessment proportionate to benefit, that the benefits should be determined by the improvement made, and the cost at all times determined by the cost of the improvement, otherwise there would be no reason, nor would there be necessity of specifying the portion of the work determined as of benefit. A mere allocation of amount would suffice. We have endeavored simply to point out that the question of reassessment remains an open one with the jurisdiction to levy vested in the assessors, subject to review by the special court provided by the statute. And under the ruling referred to (*In re Sutter-Butte By-Pass Assessment No. 6, supra*), the jurisdiction so conferred is conclusive on all questions of fact.

As a conclusion drawn from the foregoing discussion regarding the reassessment, it was proper for the trial court to consider that there might be and that there was even an uncertainty with respect to the reassessment, and that in determining the effect of the contract here involved this feature might well be considered. We do not feel that it

is necessary here to determine all of the questions that might arise upon the reassessment, nor to in anywise embarrass or preclude the action of those vested with the authority of allocating the amounts levied, but both of the appellants admit that if it were properly determined that all of the cost of the levee is chargeable to District 1001, then the contract under discussion would appear to be unquestionably unconscionable. In other words, it seems conceded that the criterion of unconscionableness is not the gain accruing to Metteer but the loss suffered by the district. Under some set of circumstances this might be true, but here we have present other conditions. It appears that at the outset the district has expended a sum in excess of $160,000 and the claim presented was for reimbursement. Nothing appearing to the contrary, it must be assumed that this original expenditure was from funds of the district or funds for which the district incurred liability. The allowance by the state board was a repayment. Therefore it is apparent that if the district gets the larger portion of the repayment from the entire area included within project No. 6 and this contract is upheld, there will be restored to the district's fund a sum lessened by some $68,000 paid for collection. Illustrating, if the district had $168,000 in its treasury and expended the same in the construction of the levee, it would make no difference from what source might come the repayment: when the entire sum was repaid there would still have to be deducted the allowance for collection, leaving the net that much short of the sum originally had. But disregarding this entirely and assuming for the present that the assessment for the surplus would fall but lightly upon the district, we are still confronted with the fact that the costs of collection—over $68,000—have been paid to the appellants and that, whatever methods of assessment or repayment may follow, there will always be diverted from reclamation purposes this amount.

In the case of *People* v. *Sacramento Drainage Dist.*, 155 Cal. 373, 379 [103 Pac. 207, 211], the court says: " . . . it was clearly desirable and beneficial to the state that all of these lands be reclaimed for purposes of husbandry. This improvement would add great wealth to the state, and . . . would result in a public benefit."

In the General Laws providing for reclamation and the agencies in charge thereof, we find this declaration of legislative purpose and intent: "The State of California and the people thereof are hereby declared to have a primary and supreme interest in having erected, maintained and protected on the banks of the Sacramento and San Joaquin rivers and their tributaries and the by-passes and overflow channels . . . good and sufficient levees and embankments or other works of reclamation, adequately protecting the lands overflowed by said streams, and confining the waters of said rivers, tributaries, by-passes and overflow channels within their respective channels." (Stats. 1913, chap. 170, pp. 252, 266.) With the foregoing in mind it would appear to make little difference from what particular fund money was improperly drawn, or upon whom the burden would expressly fall, as long as it was admitted that the charge was imposed upon the reclamation as a whole. When appellants urge the justice of their claim upon the theory that the sums claimed are to be paid by a comparatively large number, admitting as they do that if the burden fell upon a lesser number the contract could be properly classed as unconscionable, the general policy of the law, as announced, offers them little consolation. Aside then from the particular interest of the district, public policy would enter into the question and require as exact a construction in the premises as would be demanded if the district alone were involved.

This brings us directly to the contract itself. From the facts before it, as hereinbefore detailed and as will hereinafter develop, the trial court concluded that the contract and agreement between Reclamation District 1001 and C. F. Metteer, dated October 1, 1923, was and is unreasonable, unconscionable and void. It is conceded that if the facts warrant this conclusion the judgment here appealed from must be affirmed. The term unconscionable has often received judicial interpretation, but in each case the definition given reflects the facts of the case then before the court. Where great hardship and oppression have been present, fitting language expressing indignation of the court has been employed, but the exact meaning of the term cannot be embraced within a formulated definition. The determination regarding the conscience, as it were, of a con-

tract does not hinge upon the fitting of the facts to any phraseology. As was said in *Colton* v. *Stanford,* 82 Cal. 403 [16 Am. St. Rep. 137, 23 Pac. 16, 21] : "The question whether there has been an undue advantage—an unconscionable exercise of a superior power—depends largely upon the situation of the parties at the time of the negotiations." Instead, then, of announcing the rule to be that a court will not enforce a contract because it appears unconscionable, it would better be stated that because a court will not enforce an unjust contract or grant relief, the contract is thereby classed as unconscionable. And intermixed among the elements going to constitute a contract unconscionable are the elements of fairness, reasonableness, oppression and injustice, each and all dependent upon the facts of each particular case.

Completing now the facts sketched at the outset, we may more closely scrutinize the conditions existing at the time of the execution of the contract. The district had a valid claim against the state board. All of the accounting and engineering data had been prepared and the claim presented. ▮ Metteer had been the attorney for the district, and without exhaustively covering the entire field of law with reference to the relationship of attorney and client, there is ample evidence to sustain the conclusion that such a relationship did then exist between Metteer and the trustees and the district. It is not necessary to effect that relationship that there should be a general retainer or express contract to that specific end. The questions involved came within a branch of the law characterized by appellant as being highly specialized. Both at the trial and in his brief, appellant Metteer stresses this point even to the extent of complaining, though respectfully, that the honorable trial judge, by reason of lack of experience in this particular field, would be greatly handicapped in arriving at any just solution of the problems presented. Much less, therefore, could we expect familiarity with the legal questions involved on the part of the trustees of the district. When the question of the contract of Metteer was before the trustees for consideration, they were advised many times that the claim would not be allowed for any greater sum than the amount apportioned under project No. 6, namely, $40,500. Being in this state of mind, and being so advised

by Metteer, then any question of compensation in so far as it affected any proportion of the amount realized over and above $40,000 meant nothing to the trustees. ██ It is readily deducible that at the very outset the parties were not on an equal footing and that the situation was such that an unfair advantage rested with the attorney, he having a superior knowledge of the true merits of the claim. It was the duty of the attorney in dealing with his clients to exercise the utmost good faith, and before contracting to equalize the advantage by a full and complete disclosure. Citation of authority in support of this proposition is hardly necessary, though the latest expression of the Supreme Court on the subject may be found in the case of *Anderson* v. *Eaton*, 211 Cal. 113 [293 Pac. 788], wherein is reaffirmed the basic principle that it is an attorney's duty to protect his client in every possible way, and it is a violation of that duty for an attorney to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent, given after full knowledge of all of the facts and circumstances. Obviously a situation wherein skilled counsel who knows, or ought to know, the nature of his client's claim, and leaves the client uninformed or misinformed as to the legal sufficiency thereof to the end that the former secures benefits greatly out of proportion to the service rendered does not measure up to this standard. The appellants contend that the law governing attorney and client has always recognized the principle that an attorney is justly entitled to fair and reasonable compensation; that within this principle rests another, namely, that the measure of compensation varies with circumstances. From these premises grows the practice of compensation only upon contingency, referred to generally as contingent fees.

██ Much has been said by the courts of various jurisdictions on the matter of contingent fees, and the practice of contracting on that basis has been recognized and approved. Yet we cannot conclude, from the authorities reviewed, that the mere circumstance that the fee agreed upon may be contingent upon the outcome precludes any inquiry as to the reasonableness of the amount thereof. The question of the reasonableness of the fee always remains open, though the fact of contingency often determines the controversy. However, other elements may be considered, and

among these may be mentioned the status of the parties, the nature of the controversy, and the work involved. ■ It will be borne in mind that the contracting district, in the instant case, is a governmental agency, authorized and empowered to contract for legal services and to pay for the same regardless of outcome. Therefore, the matter of fees is not confined to the outcome, as is usually the case where contingent fees are considered. Further, from the record, there was no actual controversy then existing. The claim of the district had been filed with the state board and there is not the slightest evidence from which it might be fairly, or otherwise, deduced that the district would be called upon to make other than due and ordinary proof of the items detailed. No question of jurisdiction was involved and no refusal to act had been indicated. And further than this, there remained but little, if anything, in the way of revising the claim or elaborating the detail thereof. This can readily be seen when the fact appears that within approximately a month after the contract for fees was made, the claim was brought to a hearing and allowed. The work involved can be more readily appreciated from the record, which discloses that the attorney did practically nothing with the claim, and the engineering work found necessary by Gadd to familiarize himself with the claim embraced services of a value, according to his own estimate, of less than five hundred dollars.

The case of *Robinson* v. *Sharpe*, 201 Ill. 86 [66 N. E. 299, 301], presents a situation similar to the case at bar. In that case an attorney had entered into a contract with a policy-holder to collect the claimed proceeds of a life insurance policy. There, as here, the contract, contingent upon the success of the collection, provided for a fee of fifty per cent of the recovery. In declaring such a contract void and unreasonable, the court says: "The insurance company did not question liability to pay the policies, but paid them without delay upon presentation of formal proofs of death, and there is nothing in the evidence which tends to prove the company ever contemplated denying liability, or that there was any reason to apprehend there would be any necessity for litigation of any kind in the matter. Nor is there any evidence in the record tending to show that the appellant believed or expected that liability to pay would

be denied, or that resort to litigation would be necessary. Under such state of circumstances an agreement requiring his clients to pay one-half of the face of the policies can but be denounced as unfair, and obtained by undue exercise of the influence which the appellant enjoyed as the legal counselor and adviser of the appellees." In the cited case, it might be noted, there was some small showing of anticipated controversy, while in the instant case there is not even a suggestion thereof or a scintilla of evidence from which it might be even inferred that any action would be necessary other than the mere securing of a hearing upon the claim. If the reasoning of the Illinois court just quoted is sound with reference to the contracts of individuals, and we so deem it, then with much greater force would it apply to the case before us wherein one of the parties to the questioned contract is a public agency, itself a trustee. In almost every branch of government we find the subordinate agencies contracting with the government itself, and out of this relationship arise, almost daily, demands and cross-demands, and receipts and expenditures forming the basis of reciprocal claims. If, in the ordinary course, each agency involved were permitted to contract for a dissipation of the claim through contracts similar to the one under discussion, the evils which may readily be anticipated would be destructive of any idea of regulated governmental finance.

Aside from all other questions it is apparent that the power of an agency, such as a reclamation district, to contract, clothed though such a district may be with vast discretion in these matters, is always limited by the reasonableness of the contract and the soundness of the discretion exercised. The trustees of the district had no power to make a contract with Metteer under which he would receive more than the reasonable value of his services, and enough has been said hereinbefore to conclude that the contract before us did provide for payment of an amount grossly unreasonable. Therefore, it follows that the contract was beyond the power of the trustees to enter into, and therefore beyond their power to ratify. (*Bottoms* v. *Madera Irrigation Dist.*, 74 Cal. App. 681 [242 Pac. 100]; 15 Cor. Jur. 548.)

We have, to this point, considered the controversy more in the light in which it affects the parties thereto. There is another aspect of the case which in itself would be of controlling importance, namely, the question of a sound public policy. This phase of the case, strangely enough, seems to be merely hinted at in the court below and in the briefs of counsel before us, yet sufficient appears to indicate that it was constantly in mind. As hereinbefore stated, the appellant Gadd was a member of the state board, before which was pending the claim of the district. It is admitted that on many occasions prior to Gadd's resignation, and while the claim was pending, he and Metteer had sundry minor discussions regarding the claim: That Gadd was familiar with the details thereof and knew the merits of the claim and how little further work was necessary to properly shape it for action by the board. Immediately upon Gadd's resignation, or so soon thereafter that it makes no appreciable difference, we find the appellants Metteer and Gadd negotiating with the trustees on the question of Gadd's employment. It was pointed out to the trustees of the district that Gadd, by reason of his recent membership on the state board, had what was described as a pull or some roundabout influence. According to the record the word "pull" was the exact word used, and this word in its very essence and in its most common usage implies the use of an improper and undue influence. Gadd, at the outset, was desirous of a contract that would provide that he get everything recovered over and above the $40,500 provided for in the estimate under project No. 6, or at least the portion thereof embracing Metteer's fifty per cent. The negotiations between Gadd and Metteer, made known to the trustees of the district, and the urged need of Gadd's alleged pull being stressed, the trustees made the contract with Metteer, knowing of the contract either executed or about to be executed between Metteer and Gadd. One significant feature of the case here disclosed, is that it must have been apparent to all concerned that the arrangement would not bear scrutiny from the fact that, with knowledge as indicated, it was deemed expedient and tactful that there should be no express contract between Gadd and the trustees. Phrasing it bluntly, the unconscionableness of the entire transaction was mani-

fest, and the proceeding in its inception indicated a scheme rather than a contract. Courts, as such, have no monopoly on conscience, but react in conformity to general human experience, and in this connection it is interesting and instructive to note the common interpretation placed upon the contract involved by that portion of the public most concerned, and particularly the state reclamation board, as disclosed by the record before us. When the facts surrounding the claim of the district, and the particular fact of the warrants being delivered to appellants here became generally known, the state board immediately convened and attempted to reopen the claim and make further investigation concerning the same. The attitude of the state board was one naturally to be expected. This board felt that if a district could pay out a sum approximating $70,000 merely to bring to a hearing a claim for $160,000 then there must be something inherently wrong or fraudulent about the claim itself. Finding, upon examination, that the claim was correct in every detail, the other fair inference deducted from the transaction was that a claimed pull or influence with the board had been bartered, and from the record it cannot be disputed that this did not lack a factual basis. It might be deemed expedient or generous to gloss over the contract with a presumption of honesty and fair dealing, but in the face of the trial court's judgment annulling and canceling the contract, no amount of platitude or sophistry can overcome the presumptions arising when all of the concomitant facts are considered. When a member of a board or commission, before which a matter involving payment of money has been pending for some period of time without action, resigns his office and almost coincident therewith allies himself with the prosecution of the claim, and within a month thereafter secures favorable action on this undisputed claim, and for that service is awarded a sum of money approximating $50,000 out of a total claim of $160,000, it seems unnecessary to go to the authorities to find reasons why the transaction should be held unfair and of no effect. When the transaction is minutely detailed, and each proposition of law separated, it might readily be that no one principle of law would suffice to nullify the transaction. On the other hand, it is equally true that no one principle of law could add conscience thereto. The

case, as a whole, in all of its phases, must be considered, and after such consideration, we agree with the trial court that the contract was unreasonable and unconscionable, and therefore void. Thus tainted it was beyond the power of the trustees to enter into such a contract, and no act on their part could or would have the effect of giving effect to the attempted arrangement through ratification.

Summing up the entire case it can be seen that the district received nothing more than a hearing, and that for this privilege it is to be mulcted in the sum of $68,000, if the judgment should be reversed. Surely public policy and public good, as the law uses these terms, does preclude such a result. A holding in support of a contract such as this would go far toward a destruction of all public service and would bring about suspicion and distrust of public agencies and hasten an era of anarchy and chaos.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 21, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 20, 1931.